IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

BURT SMITH, KRIS JOHNSON,       )
and JAKE VOSHELL,               )
                                )    No. 4:05-cv-00068-RP-RAW
          Plaintiffs,           )
                                )    REPORT AND RECOMMENDATION
vs.                             )    ON MOTIONS FOR RELIEF
                                )    FROM A JUDGMENT OR ORDER
JOHN AULT,                      )
                                )
          Defendant.            )

Defendant has filed motions [1] under Fed. R. Civ. P.
60(b)(5) seeking relief from prospective application of the
judgment and orders of this Court in two cases, *Remmers v. Brewer*,
361 F. Supp. 537 (S.D. Iowa 1973), *aff'd,* 494 F.2d 1277 (8th Cir),
*cert. denied*, 419 U.S. 1012 (1974) and *Wycoff v. Scurr*, Civ. No.
81-cv-303-D (S.D. Iowa 1986)(as modified June 22, 1987). At issue
is the right of members of the Church of the New Song (CONS) to
continue to practice their religion at the Iowa State Penitentiary
(ISP) equally with other religions.

In *Remmers* this Court held "the Church of the New Song is
a religion within the ambit of the First Amendment." 361 F. Supp.
at 542. The Eighth Circuit affirmed in a *per curiam* decision. 494
F.2d 1277. The defendants (the ISP Warden and two prison chaplains)
were ordered to "grant the Church of the New Song members at the
Fort Madison Penitentiary the right to exercise their religion
equally with other religions," 361 F. Supp. at 544, a decree which
has been in place ever since. This Court recognized the possibility
CONS might prove to be a sham religion and cautioned: "If the

Church of the New Song should prove to be a hoax and front as the state claims it is, that eventuality can be dealt with by both the prison administration and this Court." *Id.* at 542-43.

It was not long before CONS inmates brought a contempt action against ISP officials for alleged failure to comply with the *Remmers* judgment. Prison officials cross-moved to reopen and vacate the judgment. They asked the Court to revisit CONS' status as a religion in light of holdings elsewhere that it was not, and alleged CONS in fact operated as a hoax and sham. The Court denied both motions. *Remmers v. Brewer*, 396 F. Supp. 145, 146-48 (S.D. Iowa 1975). Both sides appealed and the Eighth Circuit, which had received additional information not presented to this Court, remanded the case for further proceedings. *Remmers v. Brewer*, 529 F.2d 656, 659 (8th Cir. 1976).

On remand the case was recaptioned and a lengthy hearing was held on defendants' motion, which the Court considered under Fed. R. Civ. P. 60(b)(5). The Court adhered to its original holding that CONS was a religion entitled to First Amendment protection. The Court further concluded insufficient evidence had been presented that a ban on CONS would further the state's interest in security, order and rehabilitation at the prison. *Loney v. Scurr*, 474 F. Supp. 1186, 1195, 1197 (S.D. Iowa 1979).

Later a group of CONS members complained that CONS inmate-ministers should be permitted to visit CONS inmates in

segregation status (or "lock-up" in prison parlance). Segregated inmates of other religions were permitted to have visits from ministers of their faith. Following hearing the Court entered an injunction which, as later modified, allowed CONS inmate-ministers to visit segregated CONS inmates once a month for a period of an hour. *Wycoff v. Scurr*, Civ. No. 81-cv-303-D (S.D. Iowa April 29, 1986)(as modified June 22, 1987).

In *Goff v. Graves*, 362 F.3d 543 (8th Cir. 2004) CONS members sued prison officials because officials had not let them have their annual "Celebration of Life" festival on the date chosen by the inmates, and had not allowed CONS inmates in lock-up to receive trays of food from the Celebration banquet. The plaintiffs sought injunctive relief and a finding the defendant prison officials were in contempt of the *Remmers* decree. The defendants counterclaimed for a declaratory judgment that the plaintiffs were insincere in their professed religious beliefs and that plaintiffs' activities associated with CONS were not entitled to First Amendment protection because those activities were non-religious in nature. This Court found for the plaintiffs with respect to the right of CONS inmates in lock-up to receive food trays from the Celebration of Life banquet and dismissed the counterclaim. Both sides appealed. The Eighth Circuit held that the denial of food trays to CONS inmates in lock-up violated neither the inmates' First Amendment Free Exercise rights, nor the *Remmers* injunction.

*Id.* at 550. The court affirmed the denial of declaratory relief to the prison officials, finding the request to be an improper bypass of the *Remmers* judgment, adding "[t]he proper procedural mechanism for attacking *Remmers* is to bring a motion to dissolve the injunction entered in that case," and citing Fed. R. Civ. P. 60(b)(5). The court went on to note prison officials' prior unsuccessful efforts to revisit *Remmers* and had this to say about the record prison officials had presented in *Goff*:

> Defendant prison officials now appear to have gathered substantial evidence that CONS functions not as a religious organization but as a racist prison gang within ISP. Such evidence obviously would be highly relevant to a determination regarding the continued validity of the *Remmers* decision.

*Id.* at 551.

The present motions followed. The parties have changed. The original plaintiffs are gone or no longer interested. Burt Smith, Kris Johnson and Jake Voshell, alleged current ISP CONS members, intervened as plaintiffs and have been substituted. The current ISP Warden, John Ault, has been substituted as defendant. Due to the age of the underlying cases, the *Remmers* and *Wycoff* cases have been merged in the new case number noted in the caption.

Defendant contends the injunctions in *Remmers* and *Wycoff* should be dissolved because it is no longer equitable to give them prospective application. Fed. R. Civ. P. 60(b)(5). He argues CONS has been employed as a hoax and sham as the original *Remmers*

4

decision recognized might prove to be the case, and CONS has been used by those claiming membership as a front for gang activity, all to the detriment of the state's compelling interest in prison security. Defendant does not challenge the status of CONS as a religion. (Tr. at 4).

Over the course of three days in August 2006 an evidentiary hearing was held, and numerous exhibits were offered by defendant, many from *Goff*. Plaintiffs objected to all of defendant's exhibits and they were received subject to the objection. Extensive post-trial briefing occurred.

In the post-trial briefing plaintiffs' counsel has argued again a motion to withdraw which the Court had addressed prior to the evidentiary hearing, objections to certain testimony and exhibits being received under seal without disclosure to plaintiffs ("the sealed record"), and numerous evidentiary objections made during the course of the hearing. It is appropriate to address some of these issues, but because they concern confidential information in the sealed record, disclosure of which could affect the security of ISP and the safety of those in it, the Court has done so in a separate addendum filed under seal. This report and recommendation has not discussed sealed evidence which would reveal the particulars of confidential information or the identities of inmates who have provided such information.

# I.

## FACTUAL BACKGROUND

John Emmett testified. He was employed at ISP from November 1969 until the end of 2005, starting as a correctional officer and ending as the security director with the rank of colonel. Mr. Emmett was present at the birth of CONS and has the longest, most complete institutional memory of its history at ISP.

CONS started at ISP in the halcyon days of the early 1970's. Inmates Michael Remmers, Robert Loney and Michael Rinehart were the original leaders of the group. CONS attracted the support of a number of people from the Iowa City area who came down to join the inmates for services in the prison auditorium. Emmett recalls the services as a social event with political overtones; "they'd play music and dance and give speeches about how terrible the government was and how terrible institutions were, and just kind of a party atmosphere." (Tr. at 299). The CONS inmates were looked up to by the outsiders and other inmates for having beaten the establishment. Before long, however, the novelty wore off and the outsiders stopped coming.

In the early 1980's inmate George Goff assumed a leadership position in CONS. Prison officials became concerned about acts of violence associated with CONS members and about what they were hearing about it from other inmates. "We were getting a

lot of feedback from other inmates," testified Emmett, "but not a lot of things you could prove." (*Id.* at 301).

In the late 1980's and early 1990's there were periods when CONS was moribund. Inmates claiming to be members would get locked up or lose interest. In fact, just who the members of CONS are at any given point in time has always been something of a moving target. CONS' fortunes during this period were closely tied to Goff, who Emmett described as "the real influence" in the group. (Tr. at 302). When from time to time Goff was gone from ISP CONS languished.

In the early 1990's Scott Cupples and a new group of inmates became influential in CONS. Cupples testified for defendant. He was an original plaintiff in the *Goff* case.[1] At the time of his testimony Cupples was in the custody of the federal Bureau of Prisons following conviction, as the Court understands it, on a number of firearms charges he committed while on escape from  jail, one of his brief interludes of freedom. His federal sentence was running concurrently with an Iowa sentence. His Iowa discharge date was 2026.

When he testified Cupples was in the federal witness protection program because he had been cooperating in the federal

---

[1] Of the original thirty-five plaintiffs in *Goff* who claimed to be CONS members, seventeen voluntarily dismissed before the case was decided. *See Goff v. Graves*, Civil No. 4-97-cv-90341 (S.D. Iowa)(11/20/00 Report and Recommendation [208] at 1 n.1)(hereinafter "*Goff* Report and Recommendation").

criminal prosecution of federal inmate members of the Aryan Brotherhood. Cupples joined the Aryan Brotherhood while in federal prison following transfer from ISP. Cupples offered to cooperate after he came to believe the Brotherhood leadership had targeted him to be killed as part of a purge of non-California members.

Cupples' cooperation with federal authorities came to the attention of the Iowa Department of Corrections. Iowa authorities contacted Cupples about testifying in this case and he agreed to cooperate. The Iowa Parole Board was aware of his cooperation. Cupples had appeared before the Board and expected to be paroled on his Iowa sentence in a few months with eventual release from incarceration to continue in the witness protection program.

Cupples was first incarcerated at ISP in 1987 at the age of 19. He was a serious disciplinary problem. He fell in with some older inmates, among them George Goff. Goff asked him to join CONS because at the time CONS needed inmates to show up for services to maintain its status at the prison. Cupples attended CONS services, though he was not deeply involved with the group. He testified the services were not religious at all. The attendees just sat around and talked. Cupples discharged his original state sentence in 1991 but following his release quickly ran afoul of the law again. He was arrested in September 1991 in connection with a bingo parlor robbery, was convicted, and eventually ended up back at ISP in about 1993.

Cupples testified that when he returned to ISP CONS was nearly defunct. Not much was going on. Goff was trying to keep the group alive. Cupples said he was interested in making money in prison. With his younger brother, Pat Cupples, also an ISP inmate, he became involved in gambling, marijuana trafficking and "stores." The gambling was a numbers game of some kind. Cupples testified he and his brother were also able to smuggle marijuana into the prison through the visiting room which they sold to other inmates.[2] The "stores" involved stockpiles of commissary food items which were clandestinely sold to other inmates. Cupples testified that he had a "crew" of inmates who assisted him in his contraband activities, many of whom were CONS members.

Cupples needed a way to move money from his gambling and drug operations to outside the prison. He told Goff he was thinking about starting his own "church" to which inmates could "donate" money. This would alleviate the necessity of obtaining "clean" addresses on the outside to which inmates could have money sent by their family and friends to pay drug and gambling debts. According to Cupples, Goff invited him to use CONS for this purpose. While Cupples did not pursue his church money-transferring scheme, he said he did use CONS as a means of running his "crew." Cupples boasted that when he took over CONS membership rose from almost

---

[2] For one description of how this was done, see Ex. KK at 10-12.

nothing to about seventy right away. He said he had about fifteen or twenty inmates in his crew with seven or eight core members who ran the operations. They used their assigned time for church services in the chapel to discuss business, namely the drug, gambling and store operations. At the time there were three yard periods for general population inmates which made it more difficult for the crew members to get together to talk on the yard. CONS' assigned time for church services afforded an opportunity for relatively secure communications when all his crew members could be present. According to Cupples nothing of a religious nature occurred at these meetings.

Cupples got into a dispute with an inmate whom he had planned to attack, but the other inmate struck first and Cupples was severely injured. Cupples did not cooperate with investigators and when he was told he was going to be placed in protective custody, he reacted by attacking the correctional officers who were going to move him. He was put in isolation for a period of time after which he was sent to the Anamosa State Penitentiary.

Cupples quickly proceeded to make himself unwelcome at Anamosa. He testified he organized a gang of young white inmates with the intent of beating up some black inmates who, he said, had assaulted white inmates. At Anamosa Cupples met Jeff Winters, known as "Hawk," who introduced him to the term "Peckerwoods" or "Woods" (hereinafter "Woods"). The term was used to describe a "strong

white guy." (Tr. at 54). It was Winters' idea to call the gang Cupples was forming the Peckerwoods.

Fights broke out between Cupples' white gang and black inmates. Cupples and some of his gang members were put at the back of a cellhouse range. Cupples testified he organized a protest when one of the lieutenants announced white and black inmates would be put together in cells. Cupples and his associates tied their cells shut. Prison officials relented and Cupples was sent back to ISP. The timeframe was not clear in the testimony, but Cupples appears to have returned to ISP at some point in 1996.

When he returned to ISP Cupples was put in lock-up in the maximum security cellhouse. He made his brother, Pat Cupples, a CONS "sealed revelation minister" so that his brother could, as required by *Wycoff*, have religious visits with him. Cupples described how this worked:

> . . . If I'm not mistaken, I think that when I ordained my brother, we -- we put it and had it notarized and, I think, turned it in to someone in the administration to have them know that he was a sealed revelation minister of the church. And I would put in a kite to ask for religious counseling, and at some point in the future, I think it was twice a month or something like that, maybe even only once a month, but it was periodically that they would take me over to the visiting room so that I could have secure communications or private visit with my brother.

(Tr. at 56-57). These religious visits were no-contact visits; the brothers were separated by a glass partition. Cupples testified he

used these sessions with his brother to communicate with his crew about his illicit operations. According to Cupples CONS belonged to his crew. He and inmates Rick Shawhan and Jeff Winters (who had also been sent to ISP) were the leaders. Cupples also used his brother's visits to arrange to be provided with knives which he carried in his shoe.

After about six or eight months Cupples got out of lock-up and into "close management," a segregation status which, the Court infers from Cupples' testimony, made it easier to obtain weapons. Cupples testified that while in close management he used religious visits with his brother to obtain knives and on one occasion, to attempt to get someone to fashion some zip guns for him. He never received the guns and believes they were discovered by prison staff.

Cupples testified he used one of the knives he had had made to attack a correctional officer. The officer had called Cupples a "rat" in the hearing of other inmates.[3] The next day Cupples took a knife out of its hiding place in the sole of his shoe and made a spear by fastening it to a table leg. As the officer came by delivering drinks at lunchtime, Cupples stabbed him several times, throwing the spear at the officer as he crawled

---

[3] Cupples explained that if an inmate is falsely called out as a "rat," "child molester" or the like the inmate has two options -- to go into protective custody or "move on the guy." (Tr. at 68). Otherwise everyone will think the inmate is too weak or the charge is true.

away. Cupples was prosecuted, convicted, sentenced to additional time, and went back into lock-up.

While in lock-up again Cupples continued to use his religious visits with his brother to communicate with his crew. Cupples testified he managed to obtain a hacksaw blade which he used to cut a vent plate at the back of his cell, giving him access, as the Court understands it, to a plumbing chase or catwalk area behind the cells. Cupples described an elaborate plan to, with the assistance of two other inmates he had recruited, kill twenty-one inmates he had identified as child molesters and rats. On one of his religious visits with his brother Cupples asked his brother to have a wrench made with which he planned to unbolt the toilets from the back of his confederates' cells so that they too could leave their cells.[4] Cupples planned to take a correctional officer prisoner, get to the control panel for the cells, and open the cells of the intended victims. The plot was foiled when prison investigator James Burton, trying to determine how Cupples had managed to open his cell door to attack an inmate in a separate incident (a skill Cupples testified he had acquired), discovered the doctored vent plate in Cupples' cell.

---

[4] Cupples testified that, as he did with knives, he made a pattern for the wrench and put it in a law book he obtained from the library. Winters worked in the library, sent the book to Cupples, and received it in return. Cupples would tell his brother during a religious visit between what pages he had placed the pattern and Winters retrieved it.

By about this time Iowa prison officials had had enough of Cupples and he was transferred to a federal prison in Colorado. The date is not clear in the record, but it was probably late 1997 or early 1998.

Cupples testified he made about $3000 a month on his prison marijuana trafficking. Cupples directed the distribution through his crew. The inmate purchasers were given addresses to which they were to have friends or family send payment. These money drops were arranged by Cupples' wife or the wives or girlfriends of other inmates.

Cupples described CONS as "a tool for me to facilitate . . . the activities of my crew" without any religious component. (Tr. at 82). The religious visits with his brother gave Cupples a means to continue to operate "from the hole." (*Id.* at 83).

Plaintiffs argue most of Cupples' testimony should be disregarded because it was given in the hope of securing early release into the witness protection program, he admitted he had lied to this Court previously in affidavits and to other courts as well, and his testimony, particularly with respect to the amount of money he was making distributing marijuana and the number of CONS members he claimed to have brought in, was incredible.[5] Clearly the

---

[5] Plaintiffs also argue Cupples should have been excluded as a witness because defendant did not supplement his answer to an interrogatory in which plaintiffs had asked for identification of defendant's witnesses. Cupples was not identified in the answer. A
(continued...)

Cupples' testimony should not be taken at face value for many of the reasons given by plaintiffs. He admitted he lied to this Court and other courts prior to becoming a cooperator. His incentive is apparent. His testified-to plans to commit murder and mayhem seem incredible. Cupples' testimony that he brought some seventy new members into CONS when he co-opted it is contrary to prison records which show attendance at CONS services never remotely approached that number. As with many prisons, there are ways to get illegal controlled substances into ISP, but it is very difficult to believe Cupples was making $3000 a month.

On the other hand, in some respects Cupples' testimony was corroborated by the testimony of prison officials. As remarkable as it seems, Cupples was able to open his cell door and attack an inmate and the resulting investigation as to how he did

_____

[5](...continued)
record on this subject was made at the time of hearing. (Tr. at 23-25). The Court received Cupples' testimony subject to objection and that objection is now overruled.

Defendant disclosed Cupples as a witness about two months prior to hearing during the final pretrial process. As a pretrial disclosure the identification of Cupples was timely. Fed. R. Civ. P. 26(a)(3)(A)(i), (B). A party who does not timely supplement the answer to an interrogatory seeking the identity of witnesses is subject to having the witness excluded unless the failure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); see Fed. R. Civ. P. 26(e). As noted, Cupples was disclosed two months' prior to hearing. There was no discovery deadline in this case and plaintiffs could have requested a deposition. No claim is made that his testimony came as a surprise and no unfair prejudice has been shown. The Court finds that in the circumstances any failure to supplement the interrogatory answer was harmless.

this revealed he had in fact managed to undo the vent to gain access to the plumbing chase (or catwalk) area behind his cell. It is also true that he stabbed a correctional officer as he described. He was a CONS member and when he was not locked up did attend services with other inmates he described as members of his crew. When he was in lock-up he did have one-on-one visits with his brother, ostensibly for religious purposes as required by *Wycoff*.

While the Court does not accept Cupples' testimony entirely, the Court does find there are core elements of truth to it. The Court credits Cupples' testimony when he says he used CONS services as an opportunity to meet with members of his crew and plan activities which violated prison rules and threatened the security of the institution along the lines he generally described. The Court also credits his testimony that he abused his right while in segregation to visit with a CONS member for religious purposes, using the opportunity as a means to secure weapons and maintain control over his crew. Cupples' self-described conduct in these regards is fully in accord with his history as a violent schemer and gang leader. Defendant has established that during the time Cupples was involved CONS was used by leaders of the group to facilitate gang activity.

Investigator Burton, former Security Director Emmett, and current ISP Deputy Warden William Sperfslage all opined that CONS functioned as a gang in ISP, or was used by CONS members to further

16

illegal activities within the institution. For these reasons CONS has been designated a "security threat group" by prison officials. As summarized by Emmett, CONS members have "used the framework of the Church of the New Song to carry on illegal activities and violence in the institution . . . . [T]hroughout the history of my tenure [at ISP], various groups of people have used the same structure to do illegal activities, so the structure is what allows it to happen." (Tr. at 337-38). In addition to their own observations, each of these prison officials gave specific examples of information from inmates which they believed to be credible and upon which they based their opinion that CONS presents a threat to the institution. I find that their opinions are honestly held and supported by information which experienced prison officials would find credible. Much of what follows represents the testifying prison officials' conclusions about incidents involving CONS based on their observations, experience, investigation and information from inmate informants.

In March 2002 inmate Tom Kane was found unconscious in a cellhouse, badly beaten. He had been the victim of an assault by another inmate. The incident was attention-getting because Kane was known as a CONS leader and had a reputation within the prison as, in Deputy Warden Sperfslage's words, a "tough son of a gun." (Tr.

at 396). After the assault the older members of CONS[6] stopped attending services.

The investigation which followed the Kane assault revealed that the attack was associated with a power struggle within CONS associated with the Woods gang. The Woods recruited inmate members with promises of protection and support in return for which the inmates were expected to follow the direction of the Woods leaders. Woods members were divided between "stickers" and "smashers." The stickers, comprised principally of inmates serving life sentences, were expected to stab or stick designated victims with shanks while smashers committed assaults with their fists. According to Burton, Jeff Winters was "the number one person in the new group" with plaintiffs Voshell and Smith also playing a leadership role. (Tr. at 138, 141). With the ascendancy of the Woods in the CONS leadership, prison officials received an increased flow of information from inmate informants about assaults planned by the group to establish their authority and test the allegiance of group members.

The investigation in the aftermath of the Kane assault ultimately led to the lock-up in the summer of 2002 of seventeen inmates identified by the prison as Woods members, fifteen of whom were also CONS members, including Winters and the plaintiffs now

---

[6] Kane was one of the original plaintiffs in the *Goff* case.

named in this case.[7] As a result of the lock-up of most CONS members in 2002, CONS ceased to function as an organized group and to the time of hearing had been largely dormant.

After a lengthy investigation the locked-up CONS inmates were charged in prison disciplinary proceedings with numerous rule violations of which they were found by the administrative law judge to have committed only one, "unauthorized group/gang conduct" by membership in the Woods gang. (*See generally* Ex. P).

According to Burton, prison officials learned in September 2002 of a plot involving members of the old CONS group to take over the kitchen during a "good meal" day when senior staff would be expected to be eating in the kitchen. As the Court understands it, prison authorities believed the intent was to take staff members hostage and represented an effort by the old group to reassert itself. The alleged plot was discovered as a result of information provided by inmate informants.

The sealed testimony and exhibits contain information from inmates about planned assaults on inmates and staff, other mayhem, drug use, the operation of "stores," extortion and manufacturing of weapons by inmates associated with the Woods gang,

---

[7] The lock-up of CONS members is the subject of the Complaint in *Voshell, et al. v. Spence, et al.,* 4:03-cv-40522, which has been stayed pending the outcome of the Rule 60(b)(5) motion in this case. The fifteen *Voshell* plaintiffs alleged they were members of CONS and had wrongly been accused of being members of the Woods gang. (*Voshell* Complaint at 10-11).

most of whose members were members of CONS. The sealed record also contains testimony about statements made to prison officials by numerous former CONS members to the effect that the group engaged in no religious activity, was not much more than an opportunity for extra yard time, and Woods leaders were attempting to convert CONS into a gang. On the other hand, at least one inmate informant told prison officials that while most Woods members went to CONS services, CONS was not connected with the Woods and some of those who attended CONS meetings were not members of the Woods. (Ex. Q-3 at 6).

For the reasons indicated in the addendum accompanying this report and recommendation, I have limited consideration of information provided prison officials by inmate informants to understanding and assessing the opinions of the testifying prison officials. (Addendum at 9-12). Beyond this, the inmate informant information in the sealed record is hearsay.

The sealed record contains depositions of inmates taken in connection with the *Goff* case. The inmates testified about the activities of inmates associated with CONS at the time of the *Goff* case, 1999 and before. The testimony contains information about the involvement of CONS members in strong-arming inmates, gambling, assaults, and the manufacture of weapons including, in one instance, a gun. According to the inmate deponents who attended CONS meetings in the chapel, little of a religious nature occurred

and the attendees would discuss "business." The business was described in the testimony as obtaining money from other inmates by extortion and selling drugs. The depositions also contain testimony that CONS was perceived by other inmates as a white racist organization.

Plaintiffs argue that the fact many CONS members have a history of violence, have committed assaults in prison, been involved with drugs, gambling rings and the strong-arming of other inmates, is not sufficient to establish that their actions are associated with CONS membership. I agree. ISP is Iowa's maximum security prison for the most hardened, violent criminals. "No religious group would survive at [ISP] if disciplinary problems of its members was readily taken as a 'practice' or 'activity' of the religious group." *Goff* Report and Recommendation at 23 (citing *Loney*, 494 F. Supp. at 1195). Rather, defendants must show that the injunctions in *Remmers* and *Wycoff* entitling CONS to equal treatment with other religions have been used by inmates to facilitate the kinds of misconduct in which CONS members have admittedly engaged, including, most recently, the activities of the Woods gang. While in my judgment the record in *Goff* did not support this conclusion, *see id.*, based on the record defendant has now put forward, I find this showing has been made.

Jeff Winters, who is no longer in custody, and plaintiff Burt Smith testified for plaintiffs. Winters was a sealed

revelation minister of CONS. He described CONS services as typically starting with a reading from the Paratestament[8] followed by discussion sessions in which inmates had an opportunity to discuss issues they may have had with other inmates and the institution. According to Winters, these sessions were oriented toward avoiding bad situations. After the discussion session music was played, and inmates played cards or dominos. Winters denied criminal activities were planned at CONS meetings, denied he was a member of the Woods, said he was not aware of a gang called the Peckerwoods or Woods and there was no group at ISP with that name, though he had heard of the name.

In view of the great deal of inmate informant information prison officials received about Winters' leadership role in the Woods and their activities, it is difficult to credit his testimony that no such group existed at ISP and that in turn detracts generally from the credibility of his testimony.

---

[8] Mr. Winters described the Paratestament as the "Bible" of CONS. (Tr. at 474). Though a copy was not present at the hearing, it was believed to be part of the record in *Remmers* and was offered and received into evidence, subject to defendant's objection, in this proceeding as plaintiffs' Exhibit 1. The Court located a copy of the Paratestament in the files of the *Goff* case where it had been marked as defendants' Exhibit S. The Paratestament is a 191-page single-spaced typewritten document written by CONS founder Harry Theriault while an inmate at the federal penitentiary in Atlanta. *Remmers*, 361 F. Supp. at 540. The Court has re-marked the Paratestament as Exhibit 1 and included it in the record of this proceeding.

Burt Smith testified he joined CONS in January 2001. He came to ISP in June 1997. He testified that the underlying principles of CONS involved truth, freedom and love and that promoting fellowship was another doctrine of the church. He described CONS services as "free exercise seminars" or "rap sessions" which, similar to Winters' testimony, involved reading from the Paratestament, discussions about problems and how to resolve them, and time spent enjoying each other's company. He said CONS was not a gang and in fact tries to prevent people from acting violently. Smith described himself as a serious disciplinary problem before joining CONS in 2001, but said that since then he has had few disciplines. He denied he was a member of the Woods and said he was not aware of any gang called the Woods.

Smith had a serious disciplinary history prior to 2001 involving complicity in a stabbing (he was the lookout), possession of a shank which he had hidden in his shoe, fighting and possession of homemade alcohol. To the time of hearing he had had only two serious disciplines since 2001, for (with the other CONS members locked up in 2002) being a member of the Woods gang, and possession of a threatening poem he says was written by another CONS member inmate. The poem was very graphic about what the author envisioned should be done to prison guards. It is difficult to know what Smith's disciplinary record would have been had he not been in lock-up since 2002.

In May 2004 Smith was interviewed by a parole officer about possible participation in the Strategic Threat Group program. At that time he told the parole officer, Randy Day, and other members of the committee interviewing him that while he associated with members of the Woods, he was not a member of the Woods and not all members of CONS were Woods members. Day's testimony undercuts Smith's testimony about his lack of awareness about the Woods and as with Winters detracts generally from the credibility of his testimony. With respect to the testimony of both Winters and Smith, the Court doubts the problems or issues they said CONS members discussed at their meetings had the pacific context and purpose they ascribed to them.

## II.

### DISCUSSION

"[T]he court may relieve a party . . . from a final judgment . . . when applying [the judgment] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). In applying the rule to "an institutional reform consent decree" the U.S. Supreme Court has said that the "party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). This is intended to be a flexible standard. *Id.*

> Modification may be appropriate when changed
> factual conditions make compliance with the
> decree substantially more onerous, a decree
> proves to be unworkable because of unforeseen
> obstacles, or enforcement of the decree
> without modification would be detrimental to
> the public interest.

*Parton v. White*, 203 F.3d 552, 555 (8th Cir.), *cert. denied sub nom Cooper v. White*, 531 U.S. 963 (2000). As our court of appeals has simply put it, Rule 60(b)(5) gives the court authority "to modify an injunction when changed circumstances have caused it to be unjust." *Keith v. Mullins*, 162 F.3d 539, 540-41 (8th Cir. 1998).

If the significant change standard is met, the Court is to "consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 391. This implicates three considerations. The Court "must not create or perpetuate a constitutional violation," the goal is not to rewrite a decree merely to conform "to the constitutional floor," and local government administrators are entitled to a measure of deference. *Id.* at 391-92; *see Parton*, 203 F.3d at 555.

As with "institutional reform litigation" generally, the "public interest" should have a particularly significant role to play when considering the modification of a decree which affects the governance of a prison or jail "because such decrees 'reach beyond the parties involved directly in a suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Rufo*, 502 U.S. at 381 (quoting *Heath v. De Courcy*,

25

888 F.2d 1105, 1109 (6th Cir. 1989)); *see* 12 *Moore's Federal Practice* § 60.47[2][c] at 60-178 (3d ed. 2008)("In institutional reform litigation, the interest of the public may well be paramount.")("*Moore's*").

Though *Rufo* concerned a consent decree, the Eighth Circuit has applied its flexible standard to a contested injunction. *Keith*, 162 F.3d at 540. *See Moore's* § 60.47[2][b] at 60-176 - 60-177 (*Rufo* flexible standard should apply to all types of cases because "[t]he very nature of a flexible standard is that it is adaptable to its surroundings."). It follows that there are some cases in which it is appropriate not only to modify an injunction or decree, but to dissolve it in its entirety. *See Goff*, 362 F.3d at 551.

After carefully considering the extensive record, I have concluded defendant has established it is no longer equitable to apply the *Remmers* and *Wycoff* judgments prospectively. To begin with they are quite old, thirty-five years in the case of *Remmers* and twenty-two years in the case of *Wycoff*. Length of time is not alone sufficient to modify a decree, but the fact is much has happened in the interim. Neither ISP nor CONS are what they were then. Unlike prison officials' attempts to undo *Remmers* in the years immediately following the decision, there is now a lengthy history of the effect *Remmers* and *Wycoff* have had on prison security.

The injunction in *Remmers* was simple and sweeping, requiring that CONS members be granted the right to exercise their beliefs equally with other religions. *Wycoff* followed along in this vein. As a result CONS was given the status of a recognized religious group able to organize, meet, have an annual celebration (the "Celebration of Life"), collect money and generally function like the others as an organization.

CONS' asserted beliefs are rudimentary, focused on the support its members give each other. It is unstructured and free-wheeling, requiring very little either to join or ascend to leadership. Originating as a prison religion, it is what its inmate members say it is and its leaders are those who are able to assert themselves. The potential for abuse and consequent possibility the *Remmers* injunction would have to be modified as events would dictate has always been evident. *Remmers*, 361 F. Supp. at 542-43.

Since its early days CONS at ISP has ebbed and flowed, dormant for periods of time and then resurging. Unfortunately the record reflects its more recent rebirths have coincided with the involvement of inmate leaders who have used its structure to thwart prison rules in order to obtain contraband, money, weapons, and through violence and intimidation, to position themselves as inmates to be reckoned with. Goff used CONS to enhance his status in the prison, recruited Scott Cupples to join it and offered CONS to Cupples as a means to launder money from Cupples' drug

trafficking. Cupples used CONS to run his gang and, when Cupples
was in lock-up, to exercise control. Within a few years of Cupples'
departure, Winters and the leadership of the Woods co-opted CONS as
a means to advance the activities of the Woods gang. The Woods'
white racist overtones and dominance within CONS led to a
perception within ISP on the part of both other inmates and prison
officials that CONS had become a racist prison gang. As the Woods
moved in, a schism within CONS erupted into violence with the
beating of inmate Kane and its repercussions which led prison
officials to lock up the inmates they had identified as Woods gang
members. Because most of those locked up were CONS members, the
lock-up caused CONS to go into another period of dormancy waiting
for the next group of inmates to declare themselves as members.

As its history demonstrates, the problem with CONS has
been that for dominant inmates, or groups of inmates so motivated,
it has too often served as a ready-built, virtual clubhouse for
gang activity or other collective misbehavior with serious
implications for prison security. That in turn implicates the
strong public interest in maintaining the safety and security of
penal institutions, a paramount factor when assessing a request for
relief under Rule 60(b)(5). For all of these reasons, I conclude it
is no longer equitable to give the *Remmers* judgment prospective
effect. It follows that the judgment in *Wycoff*, which was based on
*Remmers*, should also not continue to be applied prospectively.

The final question is whether the injunctions in *Remmers* and *Wycoff* should be dissolved, or modified in a manner tailored to the changed circumstances. The former is the appropriate remedy. Both sides have treated the present motions as all or nothing and the record was not developed to provide an evidentiary basis for modification. Moreover, the changed circumstance here is the historical use of CONS' status as a recognized religious group to further gang activity. It is difficult to know how to modify a broad injunction requiring equal treatment to meet this kind of changed circumstance.

The Court is mindful that under the authority of *Remmers* CONS is a religion and its religiosity has not been questioned in this proceeding. There may be, now or in the future, inmates who sincerely believe in CONS and have no predilection to use it for illicit purposes. Those inmates may claim First Amendment and statutory rights under the Religious Land Use and Institutionalized Persons Acts of 2000, 42 U.S.C. § 2000cc-1, *et seq.*, which prison officials will be required to consider. There is a legitimate concern, therefore, that dissolving the injunctions, if not creating or perpetuating a constitutional violation, may result in one if prison officials take the ruling as a green light to suppress CONS for all time for all inmates. This ruling does no more than remove the baseline equal treatment requirement which has been abused and allow unencumbered assessment of the exercise of

CONS' beliefs in light of current legal standards and circumstances. Among those circumstances, not present when *Remmers* and *Wycoff* were issued, are the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a), and the Iowa Department of Corrections Religious Services policy which sets out a procedure for religious grievances. These changes in law and policy will provide an opportunity for prison officials and inmates to consider future CONS religious observances requests before bringing them to court.

### III.

### RECOMMENDATION AND ORDER

I respectfully **RECOMMEND** that defendant's pending Fed. R. Civ. P. 60(b)(5) motions be granted, and that defendant be relieved from the prospective application of the judgments in *Remmers v. Brewer*, 361 F. Supp. 537 (S.D. Iowa 1973), *aff'd*, 494 F.2d 1277 (8th Cir.), *cert. denied*, 419 U.S. 1012 (1974) and *Wycoff v. Scurr*, Civil No. 81-cv-303-D (S.D. Iowa 1986)(as modified June 22, 1987) by dissolution of the injunctions therein mandating, respectively, that the Church of the New Song members at ISP be granted the right to exercise their religion equally with other religions and that CONS inmate-ministers be allowed to visit segregated CONS inmates. I make this recommendation because it is no longer equitable to apply the judgments in these cases prospectively.

30

**IT IS ORDERED** that the parties have until **January 8, 2009** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Wade for Robinson v. Callahan, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. See Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of parties' right to appeal questions of fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994); Halpin v. Shalala, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); Thompson, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 5th day of December, 2008.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE